## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FIDELITY NATIONAL INFORMATION SERVICES, INC.; FIS CAPITAL MARKETS UK LIMITED;<br><br>Plaintiffs,<br><br>v.<br><br>MONTOUX INC.; MONTOUX LTD.;<br><br>Defendants. | C.A. No.<br><br>**DEMAND FOR JURY TRIAL** |

### COMPLAINT

Plaintiffs Fidelity National Information Services, Inc. and FIS Capital Markets UK Limited (collectively, "FIS") allege as follows.

### THE PARTIES

1.      Plaintiff Fidelity National Information Services, Inc. is a corporation organized under the laws of Georgia, having a principal place of business at 601 Riverside Avenue, Jacksonville, Florida.

2.      Plaintiff FIS Capital Markets UK Limited (formerly FIS Sherwood Systems Group Limited) is incorporated under the laws of England and Wales under company number 00982833. Its registered office is 25 Walbrook, London, England, EC4N 8AF.

3.      Defendant Montoux Inc. is a corporation, organized and existing under the laws of the State of Delaware, having a principal place of business at 954 Lexington Avenue, #2028, New York, New York, which maintains registered agents for service of process at 251 Little Falls Drive, Wilmington, Delaware, and 80 State Street, Albany, New York.

1

4.      Defendant Montoux Ltd. is a New Zealand limited company having a principal place of business at Level 3, 57-59 Courtenay Place, Te Aro, Wellington, New Zealand and an address for service of process at Level 4, 40 Taranaki Street, Te Aro, Wellington, 6011, New Zealand.

## NATURE OF THE ACTION

5.      This is an action for Trade Secret Misappropriation under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), Trade Secret Misappropriation under the Delaware Uniform Trade Secrets Act (Del. Code. Ann. tit. 6, § 2001 *et seq.*), and Tortious Interference with Contract.

6.      Montoux Inc. and Montoux Ltd. (collectively, "Montoux") have misappropriated, and continue to misappropriate, FIS's trade secret, confidential, and proprietary information by (a) wrongfully acquiring FIS's computer code; (b) using and making copies of FIS's computer code to make a product intended to compete with and replace FIS's products; (c) disclosing aspects of FIS's trade secret, confidential, and proprietary information to the public without authorization; and (d) training generative artificial intelligence tools using FIS's trade secret, confidential, and proprietary information without authorization. Montoux has also caused and induced, and continues to cause and induce, FIS customers to breach their contracts with FIS by soliciting and causing the unauthorized use and disclosure of certain FIS trade secret, confidential, and proprietary information to Montoux for the purposes of (a) developing Montoux products and services intended to compete with and replace FIS's products and (b) displacing FIS from its customer relationships. Montoux engages in this conduct despite knowing that its actions exceed the scope of FIS's customers' limited-scope license to use FIS's trade secret, confidential, and proprietary information.

RLF1 31816098v.1

## JURISDICTION AND VENUE

7.      FIS repeats and realleges each and every allegation set forth in Paragraphs 1 through 6.

8.      This action arises under the federal Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), the Delaware Uniform Trade Secrets Act (Del. Code. Ann. tit. 6, § 2001 *et seq.*), and Delaware common law.

9.      This Court has subject matter jurisdiction over the federal Defend Trade Secrets Act claim pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over FIS's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are substantially related to FIS's federal claim.

10.     This Court also has subject matter jurisdiction over FIS's claims pursuant to 28 U.S.C. § 1332(a) because plaintiff Fidelity National Information Services, Inc. is a citizen of Georgia and Florida, plaintiff FIS Capital Markets UK Limited is a citizen of the United Kingdom; defendant Montoux Inc. is a citizen of Delaware and New York; and defendant Montoux Ltd. is a citizen of New Zealand. The amount in controversy exceeds $75,000 exclusive of interest and costs.

11.     This Court has personal jurisdiction over Montoux Inc. because it is a Delaware corporation.

12.     This Court has personal jurisdiction over Montoux Ltd. because Delaware provides a statutory basis for this Court exercising personal jurisdiction and because Montoux Ltd. has purposefully availed itself of this Court's forum.

13.     Montoux Ltd. transacts business in this state or provides a service in this state through its subsidiary Montoux Inc. Del. Code. Ann. tit. 10, § 3104(c)(1). Further, on information

and belief, Montoux Ltd. has contracted to supply services or things in Delaware through its subsidiary Montoux Inc. Del. Code. Ann. tit. 10, § 3104(c)(2). Additionally, on information and belief, Montoux Ltd. has caused tortious injury in Delaware by actions that it or Montoux Inc. have taken in Delaware in furtherance of their misappropriation of FIS's trade secrets or their inducement of FIS's customers to breach contracts.

14.     On information and belief, Montoux Ltd. organized Montoux Inc. as a wholly owned, wholly controlled subsidiary in Delaware.

15.     On information and belief, Montoux Ltd. develops products and services, including products and services based on and using FIS's trade secrets, in New Zealand.

16.     On information and belief, Montoux Ltd. organized Montoux Inc. to coordinate and perform marketing, distribution, and sales of Montoux Ltd.'s products and services within the United States. In this way, on information and belief, Montoux Inc. serves as Montoux Ltd.'s gateway into the United States, such that Montoux Inc. brings Montoux Ltd.'s products and services and marketing campaigns to the United States market.

17.     On information and belief, Montoux Ltd. directs the activities of Montoux Inc. to such an extent that Montoux Ltd. purposefully avails itself of the privilege of doing business in Delaware. On information and belief, there is significant overlap between the officers and directors of Montoux Ltd. and Montoux Inc. Thus, on information and belief, Montoux Ltd.'s contacts with Delaware cannot be described as random, isolated, or fortuitous.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because: (i) Montoux Inc. is a resident of Delaware; and (ii) because Montoux Ltd. is not a resident in the United States and may be sued in any judicial district, and its residence must be disregarded in determining where the action shall be brought with respect to Montoux Inc. under 28 U.S.C. § 1391(c)(3).

## FACTUAL BACKGROUND

**A.      FIS and its innovative actuarial software product called Prophet.**

19.      FIS provides innovative software-based solutions to businesses all over the world. Its customers include well-known companies in finance, healthcare, insurance, and other business fields. FIS specializes in software solutions that equip its customers to process, interpret, and leverage vast amounts of data.

20.      FIS provides a suite of software products to process data and perform complex mathematics in the field of actuarial science. FIS currently refers to this suite of products as the FIS Insurance Risk Suite, which also is and has been referred to as "Prophet."

21.      Actuarial science involves using mathematical and statistical models to analyze risk factors and predict financial implications of uncertain future events. In the insurance field, actuaries apply these actuarial science principles when designing, implementing, valuing, and managing financial products. For example, an actuary might analyze life expectancy in view of factors such as smoking, diabetes, height, weight, and place of residence when pricing a life insurance product.

22.      Although the general principles of actuarial science are well known, applying them to the creation of effective and efficient tools for use in business requires creativity and innovation.

23.      Insurance companies use FIS's Prophet to do actuarial modeling for their proposed and existing insurance products.

**B.      Prophet was created through decades of research, development, and investment.**

24.      Prophet was first launched in the late 1980s. By incorporating the latest actuarial formulas into a digital environment, Prophet revolutionized the actuarial science industry. Prophet synthesized and automated decades of institutional knowledge and empirical studies in actuarial

science and applicable regulations, and enabled Prophet users to apply this curated knowledge to solve practical problems and to project forward risks to companies' balance sheets. Prophet unlocked and applied this knowledge in ways that substantially improved actuaries' abilities to analyze risk and predict outcomes in ways that were previously not possible.

25.    Prophet quickly became an industry leader. Major insurance companies around the world use Prophet daily for complex modeling. Prophet is deployed across all critical aspects of the insurance industry, such as portfolio valuations, financial product development and design, regulatory compliance, business planning, and acquisitions.

26.    From Prophet's launch to the present, teams of experts have continually innovated it to incorporate insights drawn from continuing research in actuarial science and regulation. These updates ensure that Prophet continues to offer the most innovative features and comply with current regulatory requirements. For example, FIS provides confidential updates for individual customers as well as broad-based revisions to Prophet that incorporate and transform complex regulatory changes into its modeling functions, including International Financial Reporting Standards (IFRS) 17 (2017), Long-Duration Targeted Improvements (LDTI) (2018), and Valuation Manual (VM)-22 (2018-present).

27.    FIS employs over 200 professionals with expertise in actuarial science, regulatory frameworks, and computer science dedicated to updating, improving, and maintaining Prophet for FIS's many customers. Their research and experience with Prophet's design and operation and related know-how has produced a body of trade secret, confidential, and proprietary information that provides FIS with a significant and sustained advantage over its competitors. FIS has cumulatively invested more than $100 million in the design, development, implementation, and continued maintenance of Prophet.

6

**C.    Prophet is an important tool in today's actuarial industry.**

28.    Prophet revolutionized the process of designing insurance products by giving its customers the ability to rapidly create insurance products with different underlying variables and then compare those products to each other. Before Prophet, the process of designing and comparing insurance products could take weeks or even months, which was cost prohibitive.

29.    Licensed Prophet customers can use Prophet to design and customize insurance products. Using Prophet's user interface, licensed customers build insurance products by incorporating desired variables from a library of code. Each variable tells an insurance product how to account for a specific factor, such as age, smoking status, or a physical characteristic. A variable consists of computer code and a set of one or more actuarial definitions (including formulas and tables). FIS assigns each variable in Prophet a unique name using a naming convention that is proprietary to FIS and specific to Prophet. An FIS customer uses a variable's name to incorporate the computer code associated with that variable into an insurance product. Allowing users to incorporate a variable's computer code by simply referencing the variable's name saves users from having to create the computer code relevant to that variable from scratch.

30.    Customers can also generate insurance models that allow the customer to simulate and evaluate the performance of an insurance product. After a user designs an insurance model, Prophet allows the user to run it and view the insurance model's results. Prophet also allows users to view and export product-specific computer code to text-file formats.

**D.    FIS protects the secrecy of Prophet computer code.**

31.    FIS maintains Prophet's variables, definitions, and related computer code in computer code libraries as confidential and proprietary trade secrets. This trade secret, confidential, and proprietary computer code exists in two general categories. First, application computer code makes Prophet function. Only FIS and its consultants and contractors who are

7

subject to strict confidentiality obligations from contractual agreements discussed below can access and use application computer code. Second, product-specific computer code defines the structure and function of the relevant insurance product, model, or library, as well as the related variables and actuarial definitions. Using an executable version of Prophet application computer code, Prophet users use the application's user interface to access, use, manipulate, and modify the product-specific computer code subject to the terms of contractual agreements discussed below. "Prophet computer code" as used in the complaint refers to the application computer code and product-specific computer code.

32.     Prophet's success can be attributed to its innovative Prophet computer code. Prophet arose from such a complex distillation of actuarial knowledge and continuous improvement and innovation, that it would be virtually impossible, extraordinarily expensive, and incredibly resource intensive to recreate Prophet without access to FIS's trade secret, confidential, and proprietary Prophet computer code.

33.     Accordingly, FIS takes specific actions to protect its trade secret, confidential, and proprietary Prophet computer code.

34.     Prophet is unique in the way that it gives customers flexibility in customizing insurance products. FIS provides a platform that facilitates insurance product customization by giving customers sufficient access to aspects of Prophet's computer code (i.e., the product-specific computer code) necessary to make meaningful customizations. But to protect FIS's trade secret, confidential, and proprietary computer code, FIS only grants its customers access subject to strict limits. Indeed, the secrecy of Prophet's computer code provides great value to FIS.

35.     FIS grants access to its trade secret, confidential, and proprietary Prophet computer code on a need-to-know basis to those FIS employees who require it to update, maintain, or

8

develop the computer code. Only those employees granted access to Prophet computer code can access it through a password-protected portal using their FIS credentials. Other FIS employees who are not essential to the process of updating, maintaining, or developing Prophet computer code do not have access to this portal. Using version control and monitoring software, FIS monitors and tracks the login data of all employees with access to Prophet computer code. All those with access to Prophet computer code are under express contractual obligations to keep the code and any information regarding such code confidential, and to use the code solely for purposes set forth in their contractual agreements. FIS also requires all FIS employees to complete training on access controls and protection of confidential information.

36.     FIS also grants access to its trade secret, confidential, and proprietary Prophet computer code to consultants or contractors when necessary to further the updating, maintenance, or development of the computer code. Just like FIS employees, FIS requires these consultants or contractors to access Prophet computer code through a password-protected portal. Using sophisticated version control and monitoring software, FIS monitors and tracks the login data of all consultants or contractors with access to Prophet computer code. Further, these consultants or contractors are under express contractual obligations to keep the code and any information regarding such code confidential, and to use the code solely for purposes set forth in their contractual agreements.

37.     Prophet computer code is stored on a secure FIS Azure cloud environment. All FIS facility entry points are secured with access badges. Staff access badges are only given to employees who are subject to contractual obligations not to disclose any confidential information. Building visitors are required to sign in with security and provide a valid government issued photo identification and are then issued a temporary, escort required visitor badge, and FIS employees

are advised not to discuss trade secret, confidential, and proprietary information in the presence of such persons. Visitors are escorted by an FIS employee during their time within the FIS facility and are prohibited from accessing confidential information, including information regarding Prophet computer code. Visits are documented in a visitor registration log, which includes the visitor's name, the FIS employee escort's name, the visitor's badge number, the date, the time in and time out, and the type of identification verified.

38.    In addition to systematic physical security protecting Prophet computer code, FIS's entire computer network is protected by firewalls and requires a password to login. FIS employees—whether on the FIS campus or working from an FIS device remotely—must use two-factor authentication to login. And those working from a device not located in an FIS facility must do so within a secure, password-protected virtual private network (VPN). All employees with access to FIS's network in any capacity are subject to contractual confidentiality requirements that prevent them from disclosing any confidential information regarding Prophet. FIS IT security professionals regularly monitor FIS's network to detect any anomalies or unusual activity.

39.    In addition to the physical and IT security, FIS has intellectual property policies in place that instruct employees to keep confidential any trade secret, confidential, and proprietary information. To make these policies part of FIS's culture, FIS conducts regular training on these intellectual property policies for FIS employees. Due to such training, employee policies, and employment agreements, FIS employees understand that Prophet computer code is protected as an FIS trade secret.

40.    When any aspect of FIS's trade secret, confidential, and proprietary information leaves FIS's premises, FIS takes similarly rigorous actions to ensure that it remains secret. FIS requires all customers who wish to obtain a limited-scope license to use Prophet to sign an

agreement that both requires the customer to maintain FIS's information in confidence and expressly limits the permitted uses of such information. Such customer agreements, for example, provide customers with limited access to certain FIS information regarding Prophet, while strictly limiting access and use of FIS's proprietary information, including Prophet itself and accompanying documentation, the object code and the source code for the software, the visual expressions, screen formats, report formats, and other design features of the software, ideas, methods, algorithms, formulae, and concepts used in developing and/or incorporated into the software or its accompanying documentation, future modifications, revisions, updates, releases, refinements, improvements, and enhancements of the software or accompanying documentation, and derivative works.

41.    FIS's agreements with its customers provide that FIS's proprietary information is trade secret and property of FIS, and forbid the customer from, directly or indirectly, communicating, publishing, displaying, loaning, giving, or otherwise disclosing any FIS trade secret and proprietary information to any person or entity, or permitting any person or entity to have access to or possession of any such information.

42.    FIS's agreements with its customers require that each customer keep FIS's confidential information in strict confidence and take all steps reasonably necessary to preserve the confidentiality thereof. For example, the agreements require that FIS's trade secret and confidential information shall not be used or disclosed by the customer for any purpose except as necessary to implement or perform under the agreement, or except as required by law. Agreements with customers require limited use and access to FIS's trade secret and confidential information to only those customers' employees whose responsibilities require such use or access.

RLF1 31816098v.1

43.     FIS's customer agreements require customers to maintain, in connection with the operation of FIS software, adequate technical and procedural access controls and system security requirements and devices necessary for data privacy, integrity, authorization, and virus detection and eradication. Customers must also promptly notify FIS of any actual or suspected breach of the confidentiality provisions.

44.     FIS's agreements with customers provide that customers may only use FIS's software and accompanying documentation in the ordinary course of its business operations and for its own internal business purposes.

45.     FIS developed a tool called License Manager to help ensure that its customers use Prophet as intended. When a customer opens Prophet, FIS's License Manager communicates with FIS over the internet to ensure that the customer has a valid license and that the customer is not accessing more copies of the software than licensed or modules or Prophet code that they are not licensed to use.

46.     FIS's agreements with customers provide that customers may not disclose or use the software or accompanying documentation to create a new software product.

47.     Prophet libraries provided to customers under license agreements are also expressly marked as "FIS Property" protected under trade secret laws. The marking also emphasizes that the scope of use is governed by the agreement with FIS. Specifically, the intellectual property notice included in FIS's licensed Prophet software expressly states:

> These actuarial libraries and any information related or contained therein ('FIS Property') are confidential and protected under trade secret, copyright, and database rights laws as the property of Fidelity National Information Services, Inc. and/or its subsidiaries ('FIS').
>
> FIS has made a substantial investment in developing, obtaining, verifying and presenting this FIS Property and the intellectual property contained therein includes proprietary methodologies and

confidential information, all of which has great commercial value to FIS.

Use of FIS Property is governed by the terms of the Software License Agreement. The reproduction or transmission of all or part of the FIS Property, except as strictly permitted in the Software License Agreement, is prohibited.

Any unauthorized act in relation to the FIS Property may result in civil or criminal actions.

48.    Prophet users and anyone with access to Prophet are, therefore, informed that Prophet libraries and Prophet computer code are proprietary to FIS and are notified of their obligations under the customer agreement.

49.    Documentation provided with Prophet, including an "Introduction to Prophet Tutorial" and a "Model Office Tutorial," also contains express language notifying users of the confidential and proprietary nature of Prophet computer code. Specifically, the documentation states:

This document and the software described within are copyrighted with all rights reserved. No part of this document may be reproduced, transcribed, transmitted, stored in an electronic retrieval system, or translated into any language in any form by any means without the prior written permission of FIS. FIS makes no warranties, express or implied, in this document. In no event shall FIS be liable for damages of any kind arising out of the use of this document or the information contained within it.

This document contains information that is confidential or proprietary to FIS (or its direct and indirect subsidiaries). By accepting this document you agree that:

1. If there is any pre-existing contract containing disclosure and use restrictions between you and FIS or your company and FIS, you and your company will use this information in reliance on and subject to the terms of any such pre-existing contract;

2. This document is only provided to customers who have licensed or are evaluating the Prophet Professional software. If you have received this documentation and are not licensed or currently

evaluating the Prophet Professional software, you must immediately destroy this document or, if it is in electronic format, permanently delete it.

3. If there is no contractual relationship between you and FIS or your company and FIS, you and your company agree to protect this information and not to reproduce, copy, disclose to any third party or use the information in any way without FIS' prior written consent, except as may be required by law. You acknowledge that if you or your company breach this provision, then FIS shall be entitled to take legal action against you.

50.     Prophet users and anyone with access to this document are, therefore, again informed that Prophet computer code is proprietary to FIS and are notified of their obligations under the customer agreement.

51.     By maintaining the secrecy of Prophet computer code and strictly limiting its use, FIS ensures that its competitors cannot access or misuse Prophet to develop competing products, but rather would need to make their own significant investments to develop competing software.

## MONTOUX & ITS UNLAWFUL ACTS

52.     Montoux purports to provide "actuarial AI and modeling tools." Ex. A at 1. Such modeling tools directly compete with FIS's Prophet.

53.     Montoux markets a product and service related to what it calls "actuarial model migration." Ex. B at 2. The essence of this "migration" entails moving a customer from actuarial models on FIS's Prophet to a new Montoux system instead, directly displacing FIS from the customer relationship. To accomplish this "migration," Montoux employs what it calls a "Model Replication Module." *Id.* The Model Replication Module copies Prophet computer code and then replicates it in a new Montoux actuarial model. *Id.* at 1. This behavior involves improper access to and use of FIS's trade secret, confidential, and proprietary information in violation of the customer's limited license from FIS.

A.    **Montoux could not build a competitive product.**

54.    Montoux suggests it initially designed a product to work "alongside . . . legacy systems." Ex. B at 1. But Montoux acknowledges that its customers did not want to spend "the time and cost required to keep models on the Montoux platform consistent with equivalent models on legacy actuarial systems." *Id.* at 1.

55.    Montoux acknowledges that "the cost of migrating models from proprietary legacy platforms to a platform like Montoux's is often considered prohibitive or limiting." Ex. B at 1. Indeed, Montoux admits that the "effort required for an experienced, specialized actuary to replicate a single model is between three and 12 months, depending on the model size and complexity," and that "[l]ife insurers typically have tens of models; more for the largest companies." *Id.* at 1. Indeed, Montoux understates the efforts required, as, on information and belief, it may take a team of twenty-plus people three or more years to build models for large insurance clients.

56.    The high cost associated with moving from one platform to another is in part due to the fact that new code would need to be written in the new platform to account for the decades of cumulative improvements and curated data, as well as customizations, that were previously addressed by Prophet as the "legacy" platform. The cost of honest, proper migration from one platform to another typically would be millions of dollars and would likely take years, as ensuring accuracy and reconciling results in the replacement system would require enormous effort and expertise.

B.    **Montoux decided to copy proprietary computer code.**

57.    To meet the challenge of the high cost of migration, Montoux simply copied Prophet computer code as its starting point to creating a "new" "replicated" Montoux software model.

58.     Montoux copies the computer code from "proprietary legacy platforms" using its "Model Replication Module"—a computer-code replication tool. Ex. B at 2. Montoux purports to "leverage artificial intelligence (AI) in order to reduce the time required to reconcile models to hours (small model changes) or days (new models)." *Id.* at 2. In other words, rather than design and implement its own system, Montoux offers to copy core aspects of Prophet, which the customer holds under a limited license. And there would be little to "reconcile" since Montoux simply starts with an unauthorized copy of FIS's Prophet computer code.

59.     In a step-by-step video, Montoux explains that its "Model Replication Module" (1) uses Prophet computer code as the starting point (calling Prophet computer code "legacy application software"), (2) "replicates" that code as a Montoux product (hence the name "Model Replication Module"), and then (3) migrates the customer away from FIS to the "new" Montoux software. Ex. B at 1-2.

60.     Montoux's "Model Replication Module" works by "ingest[ing] input and output data without transforming it" and then "construct[ing] a replica of an existing actuarial model." Ex. B at 2. Montoux refers to the "input and output data" as a "Source Model" or, elsewhere, as "model documentation." *Id.* at 2; Ex. D (Montoux, *Montoux Valuation Workflow Demo*, YouTube (Dec. 28, 2022) https://www.youtube.com/watch?v=jGjTSUQ4_1c) at 1:59. Accordingly, the "input data" is not data in a general sense, rather it is the actual FIS Prophet computer code. Montoux feeds this "Source Model" into its "Model Replication Module" to obtain a "Montoux Actuarial Model." The following figure from Montoux illustrates Montoux's copying procedure:



*Figure 1 – Model replication flow.*

Ex. B at 2 (annotated to highlight the "Source Model").

61.     Montoux further explains in a video that its "replication toolkit" "transforms documentation into a format that can be analyzed." Ex. D (*Montoux Valuation Workflow Demo*, YouTube, https://www.youtube.com/watch?v=jGjTSUQ4_1c) at 1:45-1:52. Montoux lists steps of this replication process: "Transform model documentation"; "Develop model understanding"; and "Convert documentation into code." *Id.* at 1:59. The first step—"Transform model documentation"—is just another way to describe Montoux's misappropriation or what it elsewhere describes as feeding the "Source Model" into the "Model Replication Module."

62.     Instead of designing and writing its own software—which would take years and cost millions of dollars—Montoux gives itself a massive head start (and relieves itself of developmental risk) by improperly accessing the "legacy" platform's code (i.e., Prophet computer code), which takes only days or weeks and costs much less.

17

63.     Montoux relies on feeding "Source Models" from "legacy" platforms into Montoux's "Model Replication Module" so that it can "replicate"—i.e., copy—those models. Montoux, therefore, needs access to "Source Models" from "legacy" platforms. The "Source Models" Montoux exploits are proprietary models of FIS Prophet computer code.

64.     FIS has never authorized Montoux, or any FIS customer, to allow Montoux to access, copy, or otherwise use Prophet computer code to inform the Montoux "replicated" product in the guise of "migrating" the customer away from Prophet ("legacy") and onto the "new" Montoux imitation product.

**C.     Montoux solicits confidential and trade secret information from those under confidentiality obligations.**

65.     On information and belief, Montoux obtains the "Source Model"—i.e., FIS's trade secret Prophet computer code—from companies who are customers of "legacy" actuarial platforms (i.e., Prophet).

66.     Montoux has publicly revealed that its "Model Replication" process begins by accessing, copying, and using FIS's "Prophet Code":



Ex. D (*Montoux Valuation Workflow Demo*, https://www.youtube.com/watch?v=jGjTSUQ4_1c) at 1:59 (annotated to highlight the phrase "Prophet Code Example"). Montoux was never given permission to use the "Prophet Code" that it employed in this public example because the "Prophet Code" is maintained as an FIS trade secret.

67.    Only FIS customers would have access to the sort of "Source Model" that Montoux needs to feed its "Replication Module." And Montoux markets its product or service to customers of "legacy" actuarial platforms, such as Prophet.

68.    Thus, on information and belief, Montoux obtains the "Source Model" by encouraging FIS customers to breach their agreements with FIS by providing the proprietary information constituting the "Source Model" to Montoux so that Montoux can feed the "Source Model" into its "Model Replication Module."

69.    On information and belief, Montoux had actual or constructive knowledge that the "Source Models" it solicits from FIS's customers consist of FIS's trade secret, confidential, and

proprietary information. As an initial matter, it is well-known in the actuarial industry that companies that make actuarial software consider their models and computer code to be proprietary and maintain their confidentiality, preventing their disclosure or misuse through agreements with customers. It is also well known that a software provider such as FIS would not permit its licensees to use FIS's computer code to create a product in competition with FIS. Moreover, Montoux demonstrates its knowledge that "legacy" software—such as FIS's—is owned by FIS and is protected by agreements forbidding disclosure by repeatedly referring to the "proprietary" actuarial systems that it intends to copy. *E.g.*, Ex. B at 1 ("proprietary legacy platforms"); Ex. F at 3 ("Proprietary actuarial languages like Prophet"). Finally, as described above, those who access Prophet are reminded of the confidential and proprietary nature of Prophet while using it at least because (1) the intellectual property notice included in FIS's licensed Prophet software states that Prophet libraries, software, and any related information are proprietary to FIS; and (2) documentation provided with Prophet states that Prophet computer code is confidential and proprietary to FIS. *Supra* ¶¶ 47-50.

70.     Montoux causes, induces, and encourages FIS's customers to disclose as much trade secret, confidential, and proprietary information of the "legacy" FIS software—Prophet—to Montoux as possible. For example, Montoux explains that its "model replication module" works best with "complete model transparency." Ex. B at 4. Montoux wants as much illicitly obtained FIS "legacy" information as possible so it can have "complete . . . transparency" into the proprietary "legacy" model. *Id.* Montoux knows the only way to fully exploit FIS's proprietary computer code (i.e., obtain "complete model transparency") is for Montoux to induce FIS customers to breach their customer agreements with FIS, which explicitly forbids the disclosure of such information.

71.     Montoux's solicitation of information from FIS's customers—including the "Prophet Code" in the video referenced above—is an intentional inducement of those customers to breach their agreements with FIS. And, again, Montoux knows such agreements exist.

72.     By soliciting and then receiving and using FIS's confidential and trade secret Prophet computer code, Montoux has been able to forego the time and expense of developing its own competing software. Had Montoux not copied FIS's confidential and trade secret computer code, it would have taken Montoux years and millions of dollars to develop its own competing software.

**D.     FIS's discovery and investigation of Montoux's misappropriation.**

73.     Upon discovering that Montoux's product and business model centered on misuse of code in competitors' products—including FIS's Prophet computer code—FIS investigated and found the example of "Prophet Code" being copied by the "replication toolkit" in the Montoux video referenced above. *See* Ex. D (*Montoux Valuation Workflow Demo*, https://www.youtube.com/watch?v=jGjTSUQ4_1c) at 1:59.

74.     FIS also discovered that, in other Montoux marketing materials, Montoux used one of FIS's proprietary and unique variable names—"DISC_PROF_A"—in an example of how its "Montoux Model Copilot" works:



Ex. C at 2 (annotated).

75.    As another example from Montoux's promotional materials, Montoux used many more of FIS's proprietary and unique variable names—including, but not limited to, "no_pols_ifsm," "death_outgo," "surr_outgo," "mat_outgo," "init_exp," "ren_exp," and "phiben_outgo"—in a video demonstrating its "Modeling Capabilities."



Ex. E (Montoux, *Montoux Github Copilot*, YouTube (Aug. 13, 2024)

https://www.youtube.com/watch?v=a8zd2XSz7AA) at 0:48 (annotated). In this video, Montoux

also touts its purported ability to "migrate models in a matter of weeks." *Id.* at 0:31-0:35.

76.     As yet another example from Montoux's promotional materials, Montoux again

used one of the FIS proprietary and unique variable names discussed above—

"DEATH_OUTGO"—in a video demonstrating its "Excel Model Documentation."



Ex. H (Montoux, *Model Copilot Excel Demo*, YouTube (Aug. 29, 2024) https://www.youtube.com/watch?v=bkJQoMoetMY) at 0:46 (annotated). In this video, Montoux touts its purported use of "generative AI" as well as its self-described "ingestion engine." *Id.* at 0:20-29.

77. These examples of Montoux using unique Prophet variable names that FIS assigned under its own naming convention serve as watermarks, demonstrating that Montoux has obtained access to FIS's confidential and trade secret computer code and that Montoux has misused that code and incorporated it into its own imitation product and is using it in its promotional materials.

78. Montoux brazenly admits that it is accessing and repackaging Prophet computer code on Montoux's own platform. In an example of a "Use Case," Montoux explains that one use for its "Model Replication Module" is "Actuarial System Consolidation." Ex. B at 4. This is a euphemism for a client leaving a "legacy actuarial platform"—like FIS's Prophet—in favor of

Montoux's imitation product, thereby "consolidating" the number of software platforms the client needs to use. In public explanations of its business, Montoux boldly proclaims that its intent is to have customers "leave legacy actuarial systems behind." Ex. G at 1.

79.     On information and belief, Montoux's strategy is to target Prophet customers.

80.     On information and belief, Montoux has approached FIS customers offering to copy FIS's Prophet trade secret, confidential, and proprietary computer code.

81.     On information and belief, Montoux has succeeded in inducing at least one FIS customer to breach its agreement with FIS. If Montoux had not successfully induced at least one customer to breach its agreement with FIS, then Montoux would not have had access to the "Prophet Code" and the unique variable names (watermarks) used in Montoux's marketing materials. The presence of "Prophet Code" and Prophet variable names in Montoux's marketing materials is evidence of the blatant nature of Montoux's copying as well as its utter disregard for FIS's intellectual property and FIS's contracts with its customers.

82.     Montoux has targeted at least one FIS customer to offer Montoux's AI product to produce Prophet model documentation. On information and belief, this demonstrates that Montoux has already gained access to FIS's Prophet computer code and trained its generative AI product on FIS's Prophet computer code. If Montoux had not already done so, it would not be possible for Montoux to generate Prophet model documentation. Montoux has also indicated to at least one FIS customer that Montoux's AI product was calibrated to produce Prophet model documentation, further indicating that Montoux had already trained its generative AI product on FIS's Prophet computer code.

RLF1 31816098v.1

83.    Montoux has stated to at least one FIS customer that Montoux's generative AI uses OpenAI's large language model. Thus, on information and belief, Montoux has trained OpenAI's large language model on Prophet computer code.

84.    Montoux also employs several individuals with extensive experience using Prophet. *See, e.g.*, Exs. I-J. Further, Montoux posts jobs seeking new employees with experience using Prophet. *See, e.g.*, Exs. K-M.

85.    Montoux's misappropriation has been willful. Montoux is systematically attempting to migrate Prophet customers away from FIS by at least targeting and misappropriating Prophet computer code and by employing and seeking to employ individuals with experience using Prophet to further its efforts to misappropriate Prophet computer code.

## INJURY TO FIS

86.    Montoux's misappropriation of FIS's confidential and trade secret information has unjustly enriched Montoux, which was able to derive revenue from FIS's efforts and avoid the time and expense of developing its own competing software.

87.    If Montoux's misappropriation of FIS's confidential and trade secret information continues, it will cause increased harm to FIS in the form of lost sales from prospective customers and lost sales from existing customers.

88.    Montoux's misappropriation of FIS's confidential and trade secret information has caused harm and will continue to harm FIS by devaluing its trade secrets.

89.    If Montoux's inducement of FIS customers to breach agreements with FIS continues, it will harm FIS in the form of lost sales from prospective customers and lost sales from existing customers.

RLF1 31816098v.1

90.     Montoux's inducement of FIS customers to breach agreements with FIS causes irreparable harm to FIS, FIS's reputation and goodwill, and the public's interest in contracts being enforced.

## COUNT I
## Trade Secret Misappropriation – Defend Trade Secrets Act
### (18 U.S.C. § 1836 *et seq.*)

91.     FIS repeats and realleges each and every allegation set forth in paragraphs 1 through 90 of this Complaint.

92.     FIS owns and possesses certain trade secret, confidential, and proprietary information, including, but not limited to Prophet computer code. This information was and is neither publicly known nor readily ascertainable.

93.     FIS (and its predecessors in interest) took and continues to take reasonable steps to guard the secrecy of its trade secrets, as detailed in paragraphs 31-51.

94.     FIS derives independent economic value from its trade secret, confidential, and proprietary information, both actual and potential, not being generally known to other persons or businesses who could obtain economic value from its disclosure or use. FIS achieved a market-leading position in the actuarial modeling software market by virtue of the fact that FIS's Prophet computer code is highly valuable due to its secrecy. Had that code been generally known or readily ascertainable, then FIS would not have achieved the licensing revenues, customer relationships, and market share that it has experienced with Prophet. FIS invested extensively in time, resources, and money to develop Prophet computer code, and FIS similarly invested in extensive measures to preserve its secrecy. FIS's investments and market position demonstrate the independent economic value derived from the secrecy of the FIS Prophet computer code.

95.     On information and belief, Montoux misappropriated FIS's trade secret information by wrongfully acquiring it from FIS's customers without FIS's consent or permission.

96.     Montoux misappropriated FIS's trade secret information by wrongfully using it to develop Montoux products, services, or both without FIS's consent or permission.

97.     Montoux misappropriated FIS's trade secret information by using and disclosing it in marketing materials without FIS's consent or permission.

98.     On information and belief, Montoux misappropriated FIS's trade secret information by training generative artificial intelligence using FIS's trade secret information without FIS's consent or permission.

99.     Montoux's misappropriation continues to the present day.

100.    Montoux's actions were and are malicious and willful and have substantially harmed FIS, thereby entitling FIS to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and/or attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

101.    As a direct and proximate result of Montoux's current and continued misappropriation of FIS's trade secrets, FIS has suffered and will continue to suffer imminent and irreparable harm.

102.    As a direct and proximate result of Montoux's current and continued misappropriation of FIS's trade secrets, Montoux has been unjustly enriched.

103.    As a direct and proximate result of Montoux's current and continued misappropriation of FIS's trade secrets, FIS has been financially harmed.

**COUNT II**
**Trade Secret Misappropriation – Delaware Uniform Trade Secrets Act**
**(Del. Code. Ann. tit. 6, § 2001 *et seq.*)**

104.    FIS repeats and realleges each and every allegation set forth in paragraphs 1 through 90 of this Complaint.

105.    FIS owns and possesses certain trade secret, confidential, and proprietary information, including, but not limited to Prophet computer code. This information was and is neither publicly known nor readily ascertainable.

106.    FIS (and its predecessors in interest) took and continues to take reasonable steps to guard the secrecy of its trade secrets, as detailed in paragraphs 31-51.

107.    FIS derives independent economic value from its trade secret, confidential, and proprietary information, both actual and potential, not being generally known to other persons or businesses who could obtain economic value from its disclosure or use. FIS achieved a market-leading position in the actuarial modeling software market by virtue of the fact that FIS's Prophet computer code is highly valuable due to its secrecy. Had that code been generally known or readily ascertainable, then FIS would not have achieved the licensing revenues, customer relationships, and market share that it has experienced with Prophet. FIS invested extensively in time, resources, and money to develop Prophet computer code, and FIS similarly invested in extensive measures to preserve its secrecy. FIS's investments and market position demonstrate the independent economic value derived from the secrecy of the FIS Prophet computer code.

108.    On information and belief, Montoux misappropriated FIS's trade secret information by wrongfully acquiring it from FIS's customers without FIS's consent or permission.

109.    Montoux misappropriated FIS's trade secret information by wrongfully using it to develop Montoux products, services, or both without FIS's consent or permission.

110.    Montoux misappropriated FIS's trade secret information by using and disclosing it in marketing materials without FIS's consent or permission.

111.    On information and belief, Montoux misappropriated FIS's trade secret information by training generative artificial intelligence using FIS's trade secret information without FIS's consent or permission.

112.    Montoux's misappropriation continues to the present day.

113.    Montoux's actions were and are malicious and willful and have substantially harmed FIS, thereby entitling FIS to exemplary damages pursuant to Del. Code. Ann. tit. 6, § 2003(b) and/or attorneys' fees pursuant to Del. Code. Ann. tit. 6, § 2004.

114.    As a direct and proximate result of Montoux's current and continued misappropriation of FIS's trade secrets, FIS has suffered and will continue to suffer imminent and irreparable harm.

115.    As a direct and proximate result of Montoux's current and continued misappropriation of FIS's trade secrets, Montoux has been unjustly enriched.

116.    As a direct and proximate result of Montoux's current and continued misappropriation of FIS's trade secrets, FIS has been financially harmed.

**COUNT III**
**Tortious Interference with Contract**

117.    FIS repeats and realleges each and every allegation set forth in paragraphs 1 through 90 of this Complaint.

118.    Each customer who has purchased access to FIS's Prophet software has a customer agreement with FIS, which is a contract between the customer and FIS.

119.    The customer agreements impose obligations on each customer, including a duty to keep FIS's confidential information in strict confidence and to not directly or indirectly,

communicate, publish, display, loan, give, or otherwise disclose any FIS trade secret and proprietary information to any person or entity, or permit any person or entity to have access to or possession of any such information.

120.    Further, the customer agreements provide that each customer may only use Prophet software and accompanying documentation in the ordinary course of its business operations and for its own internal business purposes. Thus, the customer may not disclose or use Prophet software or accompanying documentation to create a new software product.

121.    FIS performed its obligations under its agreements with its customers.

122.    On information and belief, Montoux had and has actual or constructive knowledge of the agreements between FIS and its customers.

123.    On information and belief, Montoux knowingly and intentionally interfered with FIS's agreements with its customers by soliciting FIS's customers to disclose and/or improperly use FIS trade secret and proprietary information. This would include any disclosure of any FIS trade secret and proprietary information to Montoux or any use outside the limited permissible scope of use, such as using such information to create or develop a new software product.

124.    On information and belief, Montoux successfully induced at least one FIS customer to breach its customer agreement and disclose to Montoux at least portions of Prophet computer code that constitute FIS trade secret and proprietary information.

125.    Montoux had and has no justification for its intentional solicitation of FIS's customers to disclose FIS trade secret and proprietary information in breach of the customer agreement.

126.    FIS has been or will be injured by Montoux's actions in the form of at least disruption to sales and operations; harm to good will and reputation with customers and potential customers; lost sales from prospective and existing customers; and devaluation of its trade secrets.

127.    Montoux's actions were willful and outrageous, resulting from an evil motive or reckless indifference to the rights of others.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, FIS demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, FIS respectfully requests that this Court enter judgment in its favor on each and every claim set forth above and award it relief, including the following:

A.    Permanent injunctive relief (18 U.S.C. § 1836(b)(3)(A); Del. Code. Ann. tit. 6, § 2002);

B.    Unjust enrichment in an amount to be determined at trial (18 U.S.C. § 1836(b)(3)(B)(i)(II); Del. Code. Ann. tit. 6, § 2003(a));

C.    Damages for actual loss in an amount to be determined at trial (18 U.S.C. § 1836(b)(3)(B)(i)(I); Del. Code. Ann. tit. 6, § 2003(a)) or, in the alternate, reasonable royalty damages in an amount to be determined at trial (18 U.S.C. § 1836(b)(3)(B)(ii));

D.    Exemplary damages for willful conduct (18 U.S.C. § 1836(b)(3)(C); Del. Code. Ann. tit. 6, § 2003(b));

E.    Attorneys' fees and costs (18 U.S.C. § 1836(b)(3)(D); Del. Code. Ann. tit. 6, § 2004);

F.    Pre-judgment and post-judgment interest; and

G.    All such other relief as the Court deems just, proper, and equitable.

RLF1 31816098v.1

Of Counsel:

Jeffrey A. Berkowitz
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
1875 Explorer Street
Suite 800
Reston, VA 10190-6023
(571) 203-2700

John M. Williamson
David K. Mroz
Sonja W. Sahlsten
Jonathan J. Fagan
Connor M. McGregor
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue N.W.
Washington, D.C. 20001-4413
(202) 408-4000


Dated: November 1, 2024

*/s/ Katharine L. Mowery*
Frederick L. Cottrell III (#2555)
Katharine L. Mowery (#5629)
Edmond Kim (#6835)
RICHARDS LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
mowery@rlf.com
ekim@rlf.com

*Attorneys for Plaintiffs*
*Fidelity National Information Services, Inc.,*
*and FIS Capital Markets UK Limited*